UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

FILED
Jeffrey A. Apperson, Clerk

APR  9 1999

U.S. DISTRICT COURT
WEST'N. DIST. KENTUCKY

JUN 1 5 1999

RANDY C. COCHRAN          )
                          )
and                       )
                          )
BRET V. COCHRAN           )
                          )
              Plaintiffs  )
                          )
                          )
VS.                       )   CIVIL CASE NO. 3:99CV-193-S
                          )
                          )
JANI-KING OF LOUISVILLE, INC. )
                          )
              Defendant   )

## COMPLAINT

Come the Plaintiffs, Randy C. Cochran and Bret V. Cochran, in person and by Counsel, and for their verified Complaint against the Defendant, aforesaid, state as follows:

### JURISDICTION

Plaintiffs are citizens of the State of Indiana doing business in the Commonwealth of Kentucky and the Defendant is a corporation incorporated under the laws of the State of Texas also doing business in the Commonwealth of Kentucky. The Defendant's registered office is located at 16885 Dallas Parkway, Addision, Texas 75001. The Defendant's office in the Commonwealth of Kentucky is located at 950 Breckenridge Lane, Louisville, Jefferson County, Kentucky. The matter in controversy exceeds, exclusive of interest and costs, the sum of FIFTY THOUSAND DOLLARS ($50,000.00).

## CAUSE OF ACTION

1.     On February 10, 1997 the Plaintiffs and the Defendant entered into a franchise agreement, in Louisville, Jefferson County, Kentucky wherein the Plaintiffs are designated as "franchisees" and the Defendant is designated as "franchisor".   (A copy of said franchise agreement is attached hereto as a part hereof as Plaintiffs' Exhibit A.)

2.     Pursuant to the terms of said contract, the Defendant was, and is, obligated to generate, for and/or on behalf of the Plaintiffs, business revenue of $10,000.00 per month.

3.     In good faith reliance on the provisions of said agreement, Plaintiffs tendered to the Defendant the sum of $16,625.00 required of them under the terms of said agreement and incurred an additional obligation of the same amount to be paid over a period of 48 months.

4.     The Defendant has failed and/or refused to satisfy their obligation constituting a substantial and material breach of the aforesaid agreement resulting in compensatory damages in favor of the Plaintiffs in the sum of $16,625.00 plus all payments made on the aforesaid obligation to date.

5.     As a further result of the breach of the aforesaid agreement by the Defendant, the Plaintiffs have been caused to expend additional sums of money and/or incur additional liabilities for conseqential damages in the amount equal to not less than $100,000.00.

WHEREFORE, the Plaintiffs demand as follows:

1.     Judgment against the Defendant in the sum of $$16,625.00 plus all payment made to Defendant, by Plaintiffs; for judgment against the Defendant in a sum that will adequately and reasonably compensate them for consequential damages of not less than $100,000.00 together with interest thereon at the rate of 12% per annum from the date of judgment until paid..

2.     Their costs herein expended.

3.     For any and all relief to which they may appear to be entitled.

_____
STEPHEN A. YUSSMAN
ATTORNEY FOR PLAINTIFFS
Suite 430, Hart Block Building
730 West Main Street
Louisville, KY  40202
(502) 589-3301


We, the undersigned, Randy C. Cochran and Bret V. Cochran, hereby state that we have read the foregoing document and we do hereby acknowledge its contents to be true and correct as we verily believe.


_____
RANDY C. COCHRAN

_____
BRET V. COCHRAN


COMMONWEALTH OF KENTUCKY          )
                                  )SS
COUNTY OF JEFFERSON               )


SUBSCRIBED, sworn to and acknowledged before me by Randy C. Cochran and Bret V. Cochran on this the _9th_ day of _April_, 1999.

My Commission Expires: _10/28/01_.

_____
NOTARY PUBLIC
STATE-AT-LARGE, KENTUCKY

# JANI-KING OF LOUISVILLE, INC.

## FRANCHISE AGREEMENT

AN AGREEMENT made and entered into in Dallas, Dallas County, Texas by and between JANI-KING OF LOUISVILLE, INC., a Texas Corporation, hereinafter referred as either "JANI-KING" or "Franchisor", and: Randy C. Cochran and Bret V. Cochran

hereinafter referred to, singularly or collectively, as "Franchisee", doing business as a:

[ ] Corporation,                       [x] Partnership                [ ] Sole Proprietorship
incorporated under the
laws of _____.

for the purposes of allowing Franchisee to operate a business as a Franchisee of JANI-KING.

FRANCHISE SUMMARY:  EFFECTIVE DATE: ___January 31_____, 199_7_.

PLAN: Vet-Fran _E-10_  INITIAL FRANCHISE FEE: ($_33,250.00_ )
___Thirty Three Thousand Two Hundred Fifty_____ Dollars

DOWN PAYMENT: $_16_,625.00  AMOUNT FINANCED: $_16,625.00__  TERM: _48___
                               (Interest)                               (Months)

INITIAL BUSINESS: ($_10,000.00_ ) _____Ten_____ (Thousand)

INITIAL OFFERING PERIOD: _Three Hundred Thirty_____ (_330__ ) DAYS

TERRITORY: Counties: _____Jefferson_____,

_____,

in the State of Kentucky.
N/A _____,

in the State of Indiana.

FRANCHISEE ADDRESS:

_____7204 Poplar Drive_____
CITY: _Charlestown_____ STATE: ____Indiana_____ ZIP CODE: _47111__
COUNTY: _Clark_____ TELEPHONE NUMBER: (812) 256-4602_____

JANI-KING OF LOUISVILLE, INC.
FRANCHISE AGREEMENT: 5/96 - 9/96

INT _RC_ INT
PAGE 1 OF 29

EXHIBIT "A"

# RECITALS

## SECTION 1

1.1.  Franchisor is in the business of operating and franchising professional cleaning and maintenance businesses which engage in the performance of comprehensive cleaning and maintenance services including, but not limited to, commercial, industrial, institutional and residential cleaning services, as well as the sales, leasing or distribution of related supplies and equipment under the name JANI-KING and is authorized to grant a license to use the trademark and trade names connected therewith. Trademarks as used herein shall mean all trademarks, trade names, service marks, slogans and logos, including, but not limited to, the mark JANI-KING or any other trademark or service mark which may be authorized in writing by an officer of JANI- KING. JANI-KING has developed and used and continues to use and control certain trademarks, service marks, and trade names that have become associated with its products and services so as to impart to the public superior standards of quality and service. Franchisee desires to utilize the reputation and techniques developed by JANI-KING in its business as a JANI-KING Franchisee.

## SECTION 2

2.1.  The parties to this Agreement desire that the Franchisor grant to the Franchisee a license to use methods, procedures and products developed by JANI-KING, in the business of operating a professional cleaning services company in the territory described herein and agree that such business shall be governed by terms, covenants and conditions contained in this Agreement.

## SECTION 3

### GRANT OF FRANCHISE

3.1.  For and in consideration of the full and faithful performance of each and every one of the covenants, terms and conditions herein contained and agreed to by Franchisee,  the Franchisor grants to the Franchisee the right to establish and operate a JANI-KING franchise within the "TERRITORY" described in the Franchise Summary.

3.2.  Franchisee shall operate the business at or from a location of its choosing within said territory subject to the approval of Franchisor and Franchisee's continued compliance with the terms and conditions set forth herein.

## SECTION 4

### FRANCHISEE PLEDGES:

4.1.  To operate a JANI-KING Franchise cleaning and maintenance services company in the Territory described herein, using the trade name "JANI-KING" in conjunction with its business name, as "John Doe, d/b/a JANI-KING", or "ABC Inc., d/b/a JANI-KING". Franchisee agrees not to use as part of a corporate name or other legal name, (i) the name "JANI-KING OF (any city, state, or other region)", (ii) any other janitorial, maintenance or cleaning service name in conjunction with their formal name, i.e.  such as "ABC Custodials", "ABC Maintenance", "ABC Cleaning Services" etc., (iii) a name prefix of "JANI-", or any other similarly

spelled or sounding prefix or (iv) any other trademarks, trade names or service marks or any name that has not been granted prior written approval by the Corporate Office; and that all such intellectual properties shall remain the sole property of Franchisor. All use of the JANI-KING trademarks, trade names or service marks by Franchisee shall inure to the benefit of Franchisor. All directory listings, advertising, letterhead, or any other visual or printed matter used by Franchisee to communicate to anyone shall conform to established JANI-KING policies and shall be subject to review and approval by JANI-KING prior to use and Franchisee agrees to submit to Franchisor, prior to use by Franchisee, samples of any and all advertising and promotional plans and materials of any type which contain in any manner any of the trade names, service marks, trademarks, slogans and logos as are now or which in the future may be approved for use by Franchisee.

4.2.1.  Franchisee agrees to devote sufficient time and effort to its business pursuant to this Agreement and that all work and services performed under this Agreement will be performed and/or supervised by Franchisee or its authorized agents/employees.

4.2.2.  Franchisee will follow current established JANI-KING policies, practices and procedures, and as they may be amended from time to time, and agrees not to deviate therefrom without prior written consent of Franchisor.

4.2.3.  Franchisee and all owners, officers, directors who will actively participate in the operations of the franchise business agree to successfully complete the initial training program within six (6) months of the signing of this Agreement.

4.3.  In consideration of the franchise herein granted under the "PLAN" identified in the Franchise Summary, and the initial services to be performed by Franchisor as pledged herein, Franchisee shall pay to the Franchisor the sum identified in the Franchise Summary as the "INITIAL FRANCHISE FEE", on execution of this instrument, or under the financing arrangements defined in the Franchise Summary, by the tendering of the sum identified as the "DOWNPAYMENT" and the execution of a Promissory Note for the sum of the "AMOUNT FINANCED", with interest at the rate of Twelve (12.0%) Percent, payable over the number of monthly installments identified as the "TERM".

4.3.1.  Payment of this sum shall entitle Franchisee to the right to operate a JANI-KING franchised business in the Territory described herein.  Franchisor will secure and offer commercial cleaning and maintenance contracts to the Franchisee that would provide initial gross monthly billings in accordance with the Plan purchased by Franchisee, and Franchisor agrees to offer to Franchisee the opportunity to service commercial cleaning and maintenance contracts which will provide gross monthly billings to Franchisee in the amount defined as the "INITIAL BUSINESS" in the Franchise Summary.

4.3.2.  Except as otherwise noted herein, the Initial Franchise Fee is non-refundable and is in addition to royalties and other payments set out herein.

4.3.3.  In the event that Franchisor is unable to secure and offer to the Franchisee the amount of initial gross monthly billings within the time frame allocated for the Plan purchased, a portion of the Franchisee Fee may be refundable. If the Franchisor fails to offer the full amount of initial gross monthly billings under the Plan purchased ("Initial Business"), an amount equal to three (3) times the amount of Initial Business not offered to the Franchisee will be refunded. Any such refund will be first applied to any current, unpaid fees or charges that would result in a negative due Franchisee Report, and then to any other outstanding balance owed to Franchisor by the Franchisee, including but not limited to, any promissory note; with the remaining sum, if any, credited to the Franchisee. A refund under this provision will fulfill Franchisor's obligation to offer any remaining portion of the Initial Business used to calculate the refund.

4.4. In addition to the Office Supply and Advertising Package provided to Franchisee by Franchisor as described in Schedule One of this Agreement, Franchisee is required to purchase the Professional Products and Equipment listed in Schedule One as the "Supply and Equipment Package", and also purchase, lease or provide proof of ownership to Franchisor of the following:

A commercial vacuum cleaner, a commercial floor polisher, a commercial wet/dry vacuum and a compact portable vacuum cleaner (canister type) w/shoulder strap and cloth bag, identified as "Additional Electric Equipment" in Schedule One. These items are not included in the Office Supply and Advertising Package furnished by Franchisor.

The Supply and Equipment Package and the Additional Electric Equipment must be obtained by the Franchisee before any Initial Business will be offered.

4.5.1. Franchisee agrees to pay to Franchisor or its designee by the fifth (5th) day of each month a royalty fee equal to ten percent (10%) of the gross revenues accruing to Franchisee, monthly. Gross revenue is defined as all income, whether received by Franchisee or paid to another person for the benefit of Franchisee, for any contract services, one-time cleans, extra work performed, sales of supplies, equipment or goods, whether performed or sold by Franchisee or its employees, and any other revenue related to or derived from the provision of any comprehensive cleaning and maintenance services including, but not limited to, commercial, industrial, institutional and residential cleaning services, as well as the sale, leasing or distribution of related supplies and equipment in connection with the conduct and operation of Franchisee's business or otherwise. The minimum royalty shall be Fifty Dollars ($50.00) monthly during the first twelve (12) months of operation and One Hundred Dollars ($100.00) per month thereafter. Such minimum royalty is subject to annual adjustment for increases in the Consumer Price Index.

A fee of $25 per day (the "Non-Reported Business Fee") will be charged to franchisee for each day franchisee fails to report all gross revenue earned or received by franchisee from operations of franchisee's business hereunder, in addition to any and all fees, payments, charges, chargebacks, or other amounts due and owing franchisor under the terms of this agreement as a result of such gross revenues, whether or not collected by franchisee. Such amounts shall be immediately due and payable. The payment of the Non-Reported Business Fee shall constitute liquidated damages and not a penalty, and shall be in addition to any other remedies available to franchisor at law or in equity.

4.5.2. Franchisee also agrees that Franchisor may impose, at its sole discretion, an advertising fee equal to one percent (1.0%) of Franchisee's gross revenue as defined above. Franchisor agrees to notify Franchisee of the imposition of such advertising fee, and Franchisee agrees to pay such additional sum, in addition to the royalty payment, commencing on the fifth (5th) day of the month following receipt by Franchisee of said notice and continuing on the fifth (5th) day of every month thereafter for the remainder of the term.

4.6. Franchisee further agrees to pay to Franchisor a Finder's Fee on any additional business or contracts that Franchisee accepts the designation, from Franchisor, as authorized franchisee to service such business, whether or not that additional business or contract resulted from an increase in the contract price for existing business, an expansion of service for existing business at the same or other locations, or completely new business. Finder's Fees are in addition to royalties and other payments set out in this Agreement, and are calculated on the gross monthly billing for an account according to the formulas listed below. Franchisor has no obligation to designate Franchisee for additional business or contracts beyond the initial gross monthly billings as determined by the Plan purchased. Should Franchisor, in its sole opinion, decide to designate any additional

business or contracts to Franchisee's franchise, Franchisee may either reject or accept such designation at the time they are made.

Upon designation and acceptance of any additional business or contract, the Franchisee agrees to pay an amount as a Finder's Fee according to the guidelines established by the Franchisor. Franchisor will, from time to time, establish such guidelines, policies and procedures as necessary to calculate the applicable Finder's Fee, taking into consideration industry standards and increases in costs and expenses of soliciting new accounts, and Franchisor reserves the right to increase or decrease the Finder's Fee in all categories. Currently, the following guidelines will apply, but any guideline or policy regarding the calculation of a Finder's Fee or the payment thereof, for any account, may be changed by the Franchisor at any time prior to the offering of the account:

(1)   Upon acceptance of any additional business, the Franchisee will sign an Account Acceptance Agreement, that will include the Finder's Fee calculations, and the terms of a Finder's Fee Promissory Note for the financed portion of any Finder's Fee, if any, according to the provisions set out in the Finder's Fee Schedules below.

(2)   For each of the Finder's Fee Schedules set out below, the following terms apply to calculate the Finder's Fee for the additional business:

"OVER" / "UP TO":  To determine the proper formula for a Finder's Fee payment structure within the appropriate Schedule, the Monthly Billing categories are listed by ranges, where the monthly billing will exceed the amount listed as "OVER", but less than the amount listed as "UP TO". If the monthly billing may fluctuate, the proper category of Monthly Billing will be determined by the maximum gross monthly billing allowed by the account contract.

DOWN PAYMENT:  The initial payment due at the time of acceptance of the account, or as otherwise established under these guidelines, calculated by multiplying the percentage stated in the appropriate category of Monthly Billing under Down Payment, times the appropriate gross monthly billing. All Down Payments will be calculated using the gross billing for the First Full Month of Service. "First Full Month of Service", for purposes of calculating the Down Payment, is defined as the first month in which the service is performed on or before the 15th day of the month. If a partial month is the First Full Month of Service, the gross monthly billing, for purposes of calculating the Down Payment, is determined as though the account had been serviced for the entire month. If the account begins service after the 15th, the following month will be used for purposes of the Down Payment, and no payment is due for the initial period. The Down Payment is due along with the monthly franchisee report for the First Full Month of Service (and second month as required) and may be payable as a deduction from the account billing on the franchisee report.

MONTHLY PAYMENT:  The payment made each month for the designated number of months, calculated by multiplying the percentage stated in the appropriate schedule under Monthly Payment, times the gross monthly billing for the current accounting month. However, the total of the amounts paid as Monthly Payments (exclusive of the Down Payment) shall not exceed a sum greater than 300% of: (a) for Multi-Tenant Accounts, the maximum gross monthly billing that would be generated in a month in which the building was at a one hundred percent (100%) occupancy factor, exclusive of any down payment; or (b) for Public Event or Seasonal Accounts, the average gross monthly billing for the first twelve months service is performed under the account contract, exclusive of any down payment. Monthly Payments will begin the month following any scheduled Down Payment.

MONTHS:  The number of months a Monthly Payment must be made under the terms of the Finder's Fee Promissory Note, subject to the maximum sum described in the definition of Monthly Payment.

JANI-KING OF LOUISVILLE, INC.
FRANCHISE AGREEMENT: 5/96 - 9/96

INT _B.C._ INT
PAGE 5 OF 29

(3)  Accounts will be identified according to the following definitions and the Finder's Fee will be calculated using the formula set out in the appropriate Finder's Fee Schedule for the type of account:

1.  SINGLE TENANT ACCOUNT:  An account that has a constant monthly billing established by the account contract, and has a term of one year or longer.  The Finder's Fee may be paid in full at the time of acceptance of the account, in which event, Franchisee will pay three (3) times the amount of the maximum gross monthly billing allowed under the contract, or the fee and payment will be structured according to the Schedule.

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | | DOWN | MONTHLY | |
|---|---|---|---|---|
| OVER | UP TO | PAYMENT | PAYMENT | MONTHS |
| 50 | 1,500 | 60% | 20% | 13 |
| 1,500 | 3,000 | 40% | 15% | 20 |
| 3,000 | 6,000 | 30% | 10% | 30 |
| 6,000 | 10,000 | 15% | 10% | 32 |
| 10,000 | unlimited | 5% | 5% | 65 |

2.  MULTI-TENANT ACCOUNT:  An account with a monthly billing that may fluctuate, depending on the occupancy of the property, where the billing is based on a set price per square foot of service area, and has a term of one year or longer. Any city, State or Federal account or Public School will be bid as a Multi-Tenant account.  The Finder's Fee may be paid in full at the time of acceptance of the account, in which event, Franchisee will pay three (3) times the amount of the maximum gross monthly billing that would be generated in a month in which the building was at a one hundred percent (100%) occupancy factor, or the fee and payment will be structured according to the Schedule.

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | | DOWN | MONTHLY | |
|---|---|---|---|---|
| OVER | UP TO | PAYMENT | PAYMENT | MONTHS |
| 50 | 3,000 | 30% | 5% | 72 |
| 3,000 | 6,000 | 15% | 5% | 72 |
| 6,000 | unlimited | 5% | 5% | 72 |

3.  SEASONAL ACCOUNT:  An account that will be serviced for a limited period of time but may recur on a seasonal basis.  This account may have a constant or fluctuating monthly billing.  A Down Payment is due only for the initial season. Monthly Payments are due each month until the total paid as Monthly Payments is equal to 300% of the average gross monthly billing for the first twelve months service is performed under the account contract, which may occur over several seasons.

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | DOWN PAYMENT | MONTHLY PAYMENT | MONTHS |
|---|---|---|---|
| Any Amount | 20% | 10% | Varies* |

JANI-KING OF LOUISVILLE, INC.
FRANCHISE AGREEMENT: 5/96 - 9/96

INT _RC_ INT _DC._ INT
PAGE 6 OF 29

*Until Payments equal 300% of Average Gross Monthly Billing for first twelve months.

4.  PUBLIC EVENT FACILITIES:  An account involving a public facility that houses special events for a limited duration, but similar events recur on a regularly scheduled basis.  The monthly billing will fluctuate, depending on the type of event or use of the facility, where the billing is based on the labor-hours required to service the property, and has a term of one year or longer.  Monthly Payments are due each month until the total paid as Monthly Payments is equal to 300% of the average gross monthly billing for the first twelve months service is performed under the account contract.

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | DOWN PAYMENT | MONTHLY PAYMENT | MONTHS |
|---|---|---|---|
| Any Amount | 20% | 10% | Varies* |

*Until Payments equal 300% of Average Gross Monthly Billing for first twelve months.

5.  APARTMENT TURNAROUND:  An account where one or more apartments or other facilities are serviced on a recurring basis as a make ready between occupancies or other uses.  The monthly billing will fluctuate depending on the number of units serviced, but the account contract has a term of one year or more.

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | DOWN PAYMENT | MONTHLY PAYMENT | MONTHS |
|---|---|---|---|
| Any Amount | 20% | 10% | All* |

*Each month service is performed.

6.  OTHER NON-STANDARD ACCOUNTS:  The Franchisor will establish the Finder's Fee on any other account that does not fall within one of the above definitions, prior to the account being offered to the Franchisee for designation of service.  The Finder's Fee on nonrecurring contracts, initial cleaning or one time cleaning contracts will vary but do not currently exceed twenty-five percent (25%) of the total invoiced amount.

(4)    Policies and Procedures will be established by Franchisor from time to time which regulate the amount and calculation, terms of payment, credits on termination or transfers of accounts, and other issues concerning Finder's Fees.

4.7.    Franchisee agrees that Franchisor shall have the exclusive right to perform all billing and accounting functions for the services provided by Franchisee, unless otherwise notified in writing by Franchisor. Franchisee agrees to pay Franchisor three percent (3%) of the gross revenues accruing to Franchisee, monthly, as defined herein, as an Accounting Fee, to cover Franchisor's administrative costs for this service (see Section Five). Depending on the monthly gross revenue produced the Franchise, Franchisee may be eligible for a rebate on the accounting fees paid by the Franchise. This rebate will be a percentage reduction of the accounting fee for the month(s) in which Franchisee is eligible and will be calculated each month using the following table. Franchisee's eligibility for the rebate shall be determined solely by Franchisor, and the calculation of the rebate shall be performed solely by Franchisor. Any rebate Franchisor determines Franchisee is eligible for will be

issued to Franchisee twice per year at a time determined solely by Franchisor.

| Monthly Gross Revenue (Dollars) | Accounting Rebate (Percent) |
| --- | --- |
| 0-25,000 | 0 |
| 25,001-45,000 | 0.5 |
| 45.001-65,000 | 1.0 |
| 65,001-85,000 | 1.5 |
| 85,001-Over | 2.0 |

4.7.1. Franchisor each month will invoice clients serviced by the Franchisee for the cost of services rendered or supplies provided by Franchisee. These monies will be collected by the Franchisor and paid over to the Franchisee on a monthly basis, after deduction of all appropriate fees and charges including, but not limited to, the ten percent (10%) royalty fee, the one to three percent (1-3%) Accounting Fee, any financed note payments for the initial franchise fee, Finder's Fees, advertising fees, transfer fees, chargebacks on past due invoices, any advances made to the franchisee by Franchisor, Non-Reported Business Fees, as defined hereinafter, or attorneys fees and court costs incurred by Franchisor in enforcing payment of accounts by clients. Franchisor will, on the fifth (5th) day of each month, disburse to Franchisee all monies due Franchisee as reported in the Due Franchisee Column of the Franchisee Report for the preceding month less any monies not collected from prior months ("Charge Back"), and all current receivables become the property of Franchisor. In the event the fifth (5th) day of the month falls on a Saturday, Sunday or recognized holiday, then all such amounts due to Franchisee will be disbursed before the end of the next business day.

4.8. Franchisee agrees to make all payments due Franchisor promptly in accordance with the terms of this Agreement, and recognizes that any failure on the part of the Franchisee to do so shall be deemed a substantial breach of this Agreement, and shall give Franchisor the right to terminate this Agreement immediately and retain all sums previously paid to Franchisor by Franchisee.

4.9.1. During the term of this Agreement, Franchisee shall maintain and preserve full, complete and accurate books, records and accounts regarding the Franchise business.

4.9.2. Franchisee shall, at its sole cost and expense, prepare and submit to Franchisor, upon request, and within thirty (30) days after said request, a complete financial statement for the preceding twelve month period or any other calendar year, or a financial statement compiled and reviewed by a certified accountant or public accounting firm, together with such other information in such form and detail as shall be necessary or in such form as Franchisor may reasonably require and request, so as to allow Franchisor to determine that Franchisee is properly reporting and accounting for all income that inures to it as a JANI-KING franchisee.

4.9.3. Franchisor reserves the right to inspect or examine the accounts, books, records and tax returns of Franchisee, at any reasonable time, so far as the same pertain to the business of operating a JANI-KING Franchise. Franchisor shall also have the right, at any time, to have an independent audit made of the books or financial records of Franchisee. Any such inspection, examination or independent audit shall be performed at the cost or expense of Franchisor unless the same is necessitated by the failure of Franchisee to provide the reports requested or to preserve records as provided herein, or unless the inspection, examination or independent audit discloses that any statement or report made by Franchisee is in error to an extent of five percent (5%) or more, in which case Franchisee shall immediately pay to Franchisor the amount in error and shall reimburse Franchisor

for any and all costs and expenses connected with the inspection or audit (including, without limitation, reasonable accounting and attorneys' fees).

4.10. Franchisee agrees to be solely responsible for the services and results of services performed at locations where cleaning and maintenance services are performed pursuant to this Agreement, and to hold harmless and indemnify Franchisor from any and all claims arising from actions by Franchisee or its employees.

4.11. Franchisee agrees to maintain a clean and safe place of business in compliance with OSHA and other governmental and industry standards and to conduct its business in a manner that would bring goodwill and public approval to itself and JANI-KING.

4.11.1. Franchisee is solely responsible for any leases of real or personal property in connection with the operation of its business, but agrees that Franchisor must approve office location, furniture and decor thereof to protect the image and reputation of JANI-KING. Franchisee must at all times during the term of this Agreement maintain such office and all fixtures, furnishings, signs and equipment located thereon in good order and condition, and in conformity with the JANI- KING system image as such may be prescribed by Franchisor from time to time. Franchisee must, within a reasonable time specified by Franchisor, make all necessary additions, alterations, repairs and replacements to the office as required by Franchisor, but no others without Franchisor's prior written consent, including, but not limited to, periodic repainting or replacement of signs, furnishings, equipment or decor. No other business venture shall operate out of the premises utilized by Franchisee for its office without the prior written consent of Franchisor.

4.12.1. Franchisee agrees to be solely responsible for and indemnify and hold harmless Franchisor for all loss or damage originating from or in connection with, the operation of the business and for all claims or demands for damages to property or for injury or death of persons directly or indirectly resulting therefrom of whatsoever nature. Franchisee also agrees to obtain and carry appropriate amounts of insurance, naming Franchisor and JANI-KING INTERNATIONAL, INC. as Additional Insureds, in the following minimum amounts and shall provide Franchisor with proof of coverage on demand:

| TYPE | MINIMUM LIMIT |
|---|---|
| Blanket Employee Dishonesty Bond | $    250,000 |
| Comprehensive General Liability | $ 2,000,000 |
| Non-Owned Auto | $ 1,000,000 |
| Umbrella Policy | $20,000,000 |
| Worker's Compensation | "Statutory Limits" |

4.12.2. Such insurance shall include, but not be limited to, Worker's Compensation Insurance, Employers Liability Insurance, Automobile Liability and Property Damage Insurance, Uninsured Motorist, Non-Owned Automobile, Comprehensive General Liability and Property Damage Insurance and an Employee Dishonesty Bond. The various limits may be increased or have new types of coverage added as circumstances may dictate. Franchisee shall provide Franchisor with proof of coverage and ensure that carrier will provide directly to Franchisor any cancellation notice no less than thirty (30) days prior to cancellation.

4.12.3. If Franchisee fails to secure such insurance to the satisfaction of Franchisor, Franchisor may, in addition to other remedies, purchase such insurance for the benefit of Franchisee and seek prompt reimbursement from Franchisee for all premiums and other costs incurred. Franchisee agrees to indemnify and hold Franchisor harmless from any claims, loss or damage.

4.12.4. Franchisor will offer to Franchisee, and Franchisee may participate in a contributory plan to the extent offered, which is designed to provide the Franchisee's insurance requirements set out in Section 4.12.1 above, except for Automobile Liability and Property Damage Insurance and Uninsured Motorist Coverage. Under the contributory plan, a Crime Coverage Policy will replace the Blanket Dishonesty Bond. Should Franchisee decide to participate in this contributory plan, Franchisor shall have the right to administer this plan and charge Franchisee a reasonable fee for the cost of administering said program and Franchisor or its parent may derive income from the plan. The cost of the plan may change in the future due to changes in insurance rates and Franchisor retains the right to discontinue the contributory plan upon the granting of reasonable notice to the Franchisee.

4.13. In connection with its agreement to indemnify and hold harmless Franchisor for all loss or damage as set forth in Section 4.12.1 of this Agreement, Franchisee agrees to defend Franchisor and any of its subsidiaries named in any lawsuit based on such loss or damage and to pay all costs and reasonable attorneys' fees associated with such defense. If Franchisor wishes to retain its own counsel, to defend any such action Franchisee agrees to reimburse Franchisor all reasonable costs and legal fees incurred by Franchisor for such defense. Said reimbursement shall be made to Franchisor in a timely manner as such fees are incurred by Franchisor and billed to Franchisee.

4.14. Franchisee, including officers or directors of Franchisee (where Franchisee is a corporation), agree during the term of this Agreement not to engage in, or have any financial interest in, either as an officer, agent, stockholder, employee, director, owner or partner, any other business which performs cleaning management services franchising or contracting cleaning management sales or any related business anywhere. In the event this Agreement is sold, assigned, terminated or transferred, for any reason whatsoever, Franchisee, including officers or directors of Franchisee (where Franchisee is a corporation), will have no such interest within the territory covered by this Agreement for a period of two (2) years, or in any other territory covered by a JANI-KING Franchise Agreement for a period of one (1) year, from the effective date of such termination and/or transfer, nor will it, during such period, by influencing or attempting to influence previously existing clients, whether of Franchisee or other Franchisees, divert or attempt to divert from JANI-KING or its Franchisees any business of any kind in which JANI-KING or its Franchisees were engaged at any time during the year preceding such termination and/or transfer.

4.15. Franchisee agrees to pay all personal property, sales, excise, use and other taxes, regardless of type or nature, which may be imposed, levied, assessed or charged, on, against or in connection with any services sold or furnished hereunder, whether from any state, municipality, county or parish, or other governmental unit or agency, which may have jurisdiction over such products, service and equipment.

4.16. Franchisee agrees to timely pay all debts, obligations, and encumbrances that might arise as a result of its operation of a JANI- KING Franchise. Franchisee understands that in the event it be adjudicated bankrupt, or becomes insolvent, or a receiver (whether permanent or temporary) of Franchisee's property, or any part thereof, shall be appointed by a Court of competent jurisdiction, or if Franchisee shall make a general assignment for the benefit of creditors, or if any judgement against Franchisee remains unsatisfied for thirty (30) days or longer, or if Franchisee defaults on any payments or obligations due Franchisor or its suppliers or others arising out of the purchase of supplies or the purchase or lease of equipment for use in the operation of a JANI-KING Franchise, or if Franchisee infringes, abuses or misuses any of the JANI-KING trademarks or trade names, or if the Franchisee fails to comply with any of the provisions of this Agreement except as to performance on customer accounts as set forth below, and has failed to take appropriate corrective action to the satisfaction of Franchisor within thirty (30) days after written notice by Franchisor of such failure or default, then Franchisor

may terminate this Agreement and all rights of Franchisee hereunder shall cease at the end of said thirty (30) day period or such longer period as required by law.

4.17. Franchisee agrees to be solely responsible for the services, and results of such services, performed at locations where cleaning and/or maintenance services are performed pursuant to this Agreement, and will provide all labor, materials, tools and supplies necessary to service such premises. All of such services will be performed in a good and workmanlike manner, to the satisfaction of the customer for whom such services are performed, and in accordance with the Cleaning Schedule and to the performance standards of JANI-KING. Franchisee understands and agrees that Franchisor may inspect any premises serviced by Franchisee at any time to ensure that the quality of service being rendered is in accordance with JANI-KING standards.

The following procedures apply if any account we previously provided to you as part of the Initial Business requests a transfer to another franchisee or cancels the cleaning contract:

(1) If an account cancels or is transferred to a new franchisee due to non-performance, theft, your failure to service the account properly, or your failure to comply with the Policies and Procedures, we will not replace the account.

(2) If an account cancels at no fault of yours before you service the account for 12 full months, the full gross monthly billing value of that account will be replaced within a reasonable period of time by another account or a combination of accounts, at no additional cost to you. This provision applies until you have serviced that replacement account for the remainder of the initial 12 month period. If any replacement account or combination of accounts has a greater value than the original account, the excess will be applied to the obligation of other Initial Business, or if the Initial Business obligation has been fulfilled, Finder's Fees will be charged.

EXAMPLE: An account with a monthly gross billing of $1,000 per month cancels after 7 months. We will replace the account with another account having a gross monthly billing of at least $1,000 per month. If the replacement account also happens to cancel at no fault of you at any time during the next 5 months you service the account, we will again replace the account with another $1,000 account. If either of the accounts were replaced with an account billing at $1,500 per month, the additional $500 would apply against other Initial Business obligation, or Finder's Fees would be charged.

No other obligations exist for us to replace the contracts if the contracts are canceled before the full term.

4.17.1. Franchisee and each of its employees must be in an approved, neat and clean uniform at any time they are performing services at a client's facility. A personal identifying name tag shall be considered a part of the uniform and is required for all personnel while on the premises of an account.

4.17.2. Failure of the Franchisee to comply with any provisions of this Agreement or established JANI-KING Policies and Procedures within seventy-two (72) hours after Franchisor has given notice to the Franchisee of non-compliance will be sufficient cause for Franchisor to suspend the authority of Franchisee to perform services for any or all accounts designated by Franchisor, until such time as Franchisor is satisfied that Franchisee will comply with such provisions, or, at the option of Franchisor, to transfer the account to another Franchisee, without notice or delay.

4.17.3. A representative of Franchisor will inspect the accounts from time to time in order to insure that the service of all accounts is being performed in accordance with the Cleaning Schedule and to the performance standards of JANI-KING. If at any time, whether through complaint or inspection, a deficiency in performance is discovered, Franchisor can dispatch its own staff to the account and correct all deficiencies in performance.

Franchisor has sole discretion in determining urgency and the time frame when dispatching its staff to an account.

4.17.4.  Franchisee must cooperate fully with Franchisor's staff, and pay a reasonable hourly rate ("Service Fee"), plus expenses and travel time, on each occasion Franchisor dispatches its staff to an account in order to correct a deficiency in performance.  The Service Fee will be established exclusively by Franchisor from time to time, but will not exceed the rate of $50.00 per "labor hour".  In order to promote full compliance with all JANI-KING performance standards and policies, the Complaint Fee may also be charged against the Franchisee as provided in Section 4.23.

4.17.5.  If the deficiency in performance requires immediate action to meet the client's demand for a visit or performance of services at the client's premises in less than four (4) hours, and Franchisor is not able to reach the Franchisee, or the Franchisee is not available for an immediate visit or performance of services, the Franchisee will be assessed the Service Fee, plus expenses, for the operations representative's time and effort to satisfy the needs of the customer.

4.17.6.  In the event Franchisee fails to perform the cleaning services as required by this Section, pursuant to the spirit and intent of this Agreement, and such deficiency shall continue for five (5) days cumulative within a ninety (90) day period, Franchisor may suspend the authority of Franchisee to perform services for any or all accounts designated by Franchisor, until such time as Franchisor is satisfied that Franchisee will comply with all performance standards and policies, or, at the option of Franchisor, to transfer the account.

4.17.7.  Franchisor may also exercise the option to transfer an account immediately upon receiving a request for transfer or cancellation from the customer or if Franchisee services any customer in a capacity other than as a bona fide Franchisee of Franchisor.

4.17.8.  Franchisee shall waive any and all payments for services which may become due and payable after Franchisor has exercised the option to transfer an account under any of the Sections 4.17.1 through 4.17.7. and shall not be entitled to any refund, rebate or reduction of any fees previously paid or pledged in connection with that customer's contract.  If Franchisor does not exercise any option hereunder, either in part or in full as to any deficiency or default, that shall not constitute a waiver of such rights as to the same or any subsequent deficiency or default.

4.18.  Franchisee shall provide Franchisor, upon Franchisor's request, a list of all of Franchisee's customers and copies of their respective contracts.  Customer lists or any part thereof shall not be disclosed by Franchisee to anyone other than its employees without Franchisor's prior written consent.

4.18.1.  Neither franchisee nor any Controlling Principal shall, during the term of this Agreement or thereafter, communicate, divulge or use for the benefit of any other person, persons, partnership, association or corporation and, following the expiration or termination of this Agreement, they shall not use for their own benefit, any confidential information, knowledge or know-how concerning the methods of operation of the franchised business which may be communicated to them or of which they may be apprised in connection with the operation of the Franchise under the terms of this Agreement.  Franchisee and Controlling Principals shall divulge such confidential information only to such of Franchisee's employees as must have access to it in order to operate the Franchise.  Any and all information, knowledge, know-how, techniques and any materials used in or related to the System which Franchisor provides to Franchisee in connection with this Agreement shall be deemed confidential for purposes of this Agreement.  Neither Franchisee nor the Controlling Principals shall at any time, without Franchisor's prior written consent, copy, duplicate, record or otherwise make the same

JANI-KING OF LOUISVILLE, INC.
FRANCHISE AGREEMENT: 5/96 - 9/96

INT _D.C._ INT
PAGE 12 OF 29

available to any unauthorized person. The covenant in this Section shall survive the expiration, termination or transfer of this Agreement or any interest herein and shall be perpetually binding upon Franchisee and each of the Controlling Principals.

4.19.1. Franchisee agrees to provide Franchisor with at least ten (10) days written notice of each occasion upon which it desires to discontinue service to a business, and to obtain the written consent of Franchisor before doing so. On this happening, or, in the event Franchisee fails to service any account as a bona fide JANI-KING Franchisee for a period of two cumulative days Franchisor reserves the right to begin servicing such account itself or to allow another Franchisee to begin servicing such account, in which event Franchisee shall be considered as having waived any and all payments (regardless of when services were rendered) due after Franchisee no longer services the account, and Franchisee shall not be entitled to any refund or rebate of any fees paid or pledged previously to Franchisor for such business.

4.19.2. Additionally, the Franchisee may solicit and obtain contracts to provide cleaning and maintenance services. The terms of the contracts must be approved by Franchisor and the agreement must be an approved form, the master format of which is provided by Franchisor. The contract must provide that Franchisor is a third party beneficiary to the agreement and that such contract may be assigned to franchisor if the Franchise Agreement is terminated or expires, if Franchisee does not wish to continue servicing such contract as a bona fide JANI-KING Franchisee, or if Franchisee fails to maintain the quality standards established by JANI-KING policies and procedures. The contracts shall further provide that the contract is subject to all of the terms and conditions contained in this Agreement. A copy of the contract shall be submitted to Franchisor immediately upon signing.

4.20. Upon termination or non-renewal of this Agreement for any reason, Franchisee shall immediately and permanently cease all use of JANI-KING trademarks, trade names, trade secrets, and all aspects of the JANI-KING system, and shall cease indicating verbally or in writing to clients and any other Franchisee that it is still a JANI-KING Franchisee. Franchisee shall immediately return to JANI-KING all advertising matter, products or writing that contain JANI-KING's trade name, logo or copyright, as well as any information of a proprietary nature such as lists and files pertaining to customers, operational documents and similar information. All such lists, files and the information contained therein shall remain the exclusive property of Franchisor. Any keys to buildings, security passes and/or codes shall be turned over to Franchisor at the time the Franchisee is to cease servicing the business.

4.21. If this Agreement is terminated or not renewed for any reason, such termination or non-renewal shall not be effective until Franchisee surrenders to Franchisor all property belonging to Franchisor including, but not limited to, keys to all clients' buildings and all contracts between Franchisor and Client. Franchisee agrees that the above-named items are the property of Franchisor. Franchisee must also pay, in full, all amounts owed to Franchisor at the date of termination or non-renewal and surrender any and all equipment belonging to Jani-King. Until Franchisee complies with each obligation hereunder, this Agreement shall be deemed effective and not terminated. Once Franchisee has, in Franchisor's sole opinion, complied with this paragraph, this Agreement shall be deemed terminated.

4.22. If Franchisee has proclaimed to have terminated or not renewed the Agreement and refused to surrender the items described herein, the parties agree Franchisee shall pay One Thousand dollars ($1,000.00) per day for each day that it has not complied with the foregoing paragraph. The parties acknowledge that damages for Franchisee's failure to adhere to the foregoing paragraph are difficult to ascertain and therefore agree that this amount shall be payable as liquidated damages and not as a penalty.

4.23. In order to promote full compliance with all JANI-KING performance standards and policies, a Fifty dollar ($50.00) Complaint Fee will be charged to any Franchisee who does not comply with the time frames allotted for initial response or corrective action to a customer complaint, requiring the Regional Office personnel of Franchisor to respond to the complaint. "Serviced" or "respond to" the complaint in this case means communicating with the client to determine the nature of the complaint and what needs to be done to resolve the situation, and to provide the customer relations necessary to try to protect the account. It does not mean providing cleaning or maintenance services to the client to solve the problem. An additional "Service Fee" established in Section 4.17.4 will be assessed, plus expenses (i.e., labor, materials, supplies, equipment, etc.), for the Regional Office personnel time spent on commercial cleaning services required to rectify the complaint or satisfy the unhappy client. The following is the procedure for charging the Complaint Fee:

If at any time, whether through complaint or inspection, a deficiency in performance is discovered concerning an account cleaned by Franchisee, Franchisor has a four (4) hour period in which to make contact with the Franchisee (calling a minimum of once each hour) and report the complaint to Franchisee.

The Complaint Fee, plus the Service Fee and expenses, will be charged under either of the following conditions:

(a) Franchisor cannot locate the Franchisee during the four (4) hour period (calling a minimum of once each hour) and the Operations Department must respond to the complaint; or,

(b) If the complaint was made known to the Franchisee, and if two (2) hours after the opening of the business the next morning, the deficiency in performance has not been corrected to the satisfaction of the client and Franchisor, thus requiring the Operations Department of Franchisor to respond to the complaint.

4.23.1. The Fifty Dollar ($50.00) Complaint Fee, plus the Service Fee and expenses, will be charged to the Franchisee responsible for the complaint, even if the account must be transferred to save it, or if the account terminates for non-performance. The fees will be payable in the month they are incurred.

4.24. Franchisor reserves the right to establish company policies and/or procedures pertaining to the operation of Franchisee's franchised business, or this Agreement. Franchisee agrees that it will be bound by said policies and/or procedures upon receipt of same by Franchisee. Franchisor shall keep a current updated manual of all such policies and procedures at Franchisor's corporate office. In the event that policies and procedures kept by Franchisor differ from those kept by Franchisee, the policies and procedures maintained in Franchisor's corporate office manual shall be controlling.

4.25. The Franchisee acknowledges that the system must continue to evolve in order to reflect the changing market and to meet new and changing customer demands, and that accordingly, variations and additions to the system may be required from time to time in order to preserve and enhance the public image of the system and to ensure the continuing operational efficiency of Franchisees generally. Accordingly, the Franchisee agrees that the Franchisor may from time to time hereafter or otherwise change the system, including, without limitation, the adoption and use of new or modified trademarks, products, services, equipment and furnishings and new techniques and methodologies relating to the preparation, sale, promotion and marketing of service and supplies. The Franchisee agrees to promptly accept, implement, use and display in the operation of the franchise business all such additions, modifications and changes at its sole cost and expense.

4.26. Franchisee agrees that if it or any of its employees develop any new concept, process or improvement in the operation or promotion of the Franchised Business, it will promptly notify Franchisor and provide Franchisor with all necessary information concerning same, without compensation. Franchisee acknowledges that any such concept, process or improvement shall become the property of Franchisor and Franchisor may utilize or disclose such information to other franchisees as it determines to be appropriate.

## SECTION 5

## NONCOMPETITION

5.1. Franchisee specifically acknowledges that, pursuant to this Agreement, Franchisee and Franchisee's employees will receive valuable specialized training, trade secrets and confidential information, including, without limitation, information regarding the operational, sales, promotional and marketing methods and techniques of Franchisor and the JANI-KING program over and above the ordinary skills and experience possessed by Franchisee, Franchisee's partners, investors and employees prior to execution of this Agreement In consideration for such training, trade secrets and confidential information, Franchisee, including officers and directors of Franchisee where Franchisee is a corporation, agrees that during the term of this Agreement, and for a continuous uninterrupted period commencing upon expiration or termination of this Agreement, regardless of the cause for termination, and continuing for (2) years thereafter, except as otherwise approved in writing by Franchisor, neither Franchisee, nor the officers or directors of Franchisee, nor Franchisee's employees shall, directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, persons, partnership or corporation:

(a) Divert or attempt to divert any business or customer of the business franchised hereunder or any JANI-KING Franchisee anywhere to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's trademarks or trade names or the Franchise program anywhere.

(b) Employ or seek to employ any person who is at that time employed by Franchisor or by any other franchisee of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment.

(c) Own, maintain, operate, engage in or have any interest in any business which is the same as or similar to the franchised business, which business is, or is intended to be, located within the territory of this Agreement; or in any other territory covered by a JANI-KING Franchise Agreement for a period of one (1) year.

5.2. The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Section is held unreasonable or unenforceable by a court or agency having valid jurisdiction in any unappealed final decision to which Franchisor is a party, Franchisee and Franchisee's employees expressly agree to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Section.

5.3. Franchisee understands and acknowledges that Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Section, or any portion thereof, without its consent, effective immediately upon written notice to Franchisee; and Franchisee agrees that it shall comply forthwith with any covenant as so modified, which shall be fully enforceable notwithstanding the provisions of any other Sections hereof.

JANI-KING OF LOUISVILLE, INC.
FRANCHISE AGREEMENT: 5/96 - 9/96

INT _B.C._ INT
PAGE 15 OF 29

5.4. Franchisee expressly agrees that the existence of any claims it may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this Section. Franchisee agrees to pay all costs and expenses (including reasonable attorneys' fees) incurred by Franchisor in connection with the enforcement of this section of this Agreement.

5.5. Franchisee acknowledges that a violation of the terms of this Section would result in irreparable injury to Franchisor for which no adequate remedy at law may be available, and Franchisee accordingly consents to the issuance of an injunction prohibiting any conduct by Franchisees in violation of this Section.

5.6. At Franchisor's request, Franchisee shall require and obtain execution of covenants similar to those set forth in this Section (including covenants applicable upon the termination of a person's relationship with Franchisee) from any or all managers of Franchisee and any other personnel employed by Franchisee who have received or will receive training from Franchisor. Every covenant required by this Paragraph shall be in a form satisfactory to Franchisor, including, without limitation, specific identification of Franchisor as a third party beneficiary of such covenants with the independent right to enforce them. Failure by Franchisee to obtain execution of a covenant required herein shall constitute a material event of default under the terms of this Agreement.

## SECTION 6

## FRANCHISOR PLEDGES

6.1.1. To secure and offer Franchisee the opportunity to service signed commercial cleaning and/or maintenance contracts that in total would provide a minimum in gross monthly billings in an amount defined as the "INITIAL BUSINESS" in the Franchise Summary, from services within the designated Territory as described herein. These contracts will be secured and offered within the number of days identified in the Franchise Summary as the "INITIAL OFFERING PERIOD", such time period beginning on the date all required equipment and supplies have been obtained, the Acknowledgment of Completion of Training is signed and proof of required insurance is provided to JANI-KING or such later date as requested by the Franchisee and which is agreed to by Franchisor, or as provided below.

6.1.2. The actual time to secure and offer the Initial Business to the Franchisee may, at Franchisor's sole discretion, be automatically extended under the following conditions: (1) If Franchisee requests a delay in the offering of the Initial Business; (2) If the Franchisee is in default under the terms and conditions of the Franchise Agreement or any other agreements between Franchisee and Franchisor; or (3) If any of the Initial Business previously provided to Franchisee requests a transfer to another Franchisee or requests to be cancelled due to non-performance, then Franchisee must successfully repeat and complete to Franchisor's satisfaction all JANI-KING training classes. Franchisor will have the remainder of the Initial Offering Period or a minimum of 120 days, which ever is longer, from the date: (1) Franchisee notifies Franchisor that they are ready to accept other business and has provided any documentation required under the Policies and Procedures; (2) Franchisee has cured any default; or (3) the acknowledgment of retraining is signed, to offer the balance of Initial Business to Franchisee. We do not guaranty that the Initial Business will reach or remain at the stated level of the plan you purchase through the term of the Franchise Agreement.

6.2. To provide Franchisee with the Office Supply and Advertising Package outlined in Schedule One of this Agreement.

6.3. To make available to Franchisee applicable confidential manuals, training aids and any pertinent information concerning JANI- KING methods and practices.

6.4. To provide an initial local training program to include JANI-KING cleaning methods, systems and programs using established JANI-KING procedures and forms. Franchisee agrees to successfully complete the training within six (6) months after the date of this Agreement.

6.5. To continue appropriate assistance and guidance until Franchisee has been offered clients that generate initial gross monthly billings as required by the Franchise plan purchased; to provide marketing and technical assistance and consultation and advice on operating procedures; and to offer sales, marketing, technical assistance and consultation and advice on operating procedures.

6.6. To provide additional training and support for Franchisee at reasonable rates as established by JANI-KING policies and procedures, currently at a rate of Fifty Dollars ($50.00) per hour, plus expenses.

6.7. To allow Franchisee the non-exclusive right in the territory described hereinabove to use the JANI-KING marks, insignia, logo, design and color scheme subject to limitations and restrictions herein, and to utilize the processes, methods, materials, equipment and promotional plans developed by JANI-KING.

6.8. To permit Franchisee the right to profit from its efforts, commensurate with its status as owner of its business, and, correspondingly, to bear the risk of loss or failure that is characteristic of this status.

6.9. To have available for Franchisee all appropriate facets of the JANI-KING system as well as all pertinent new developments in the cleaning services industry including procedures for improved efficiency.

6.10. To have available for Franchisee, at Franchisor's discretion and at a reasonable cost, promotional materials, sales and service manuals, equipment and other materials as they are developed that would be relevant to the operation of a JANI-KING franchise.

## SECTION 7

## ADDITIONAL SERVICES

7.1. There shall be no other additional services provided by Franchisor to Franchisee except as explicitly set out in this Agreement.

## SECTION 8

## DEFAULT AND TERMINATION

8.1. Franchisee shall be deemed to be in default, and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon the provision of notice to Franchisee, either by mailing or hand delivery, upon the occurrence of any of the following events:

(a) If Franchisee or any of its Principals is convicted of a felony, a crime involving moral turpitude, or any other crime or offense that is reasonably likely, in the sole opinion of Franchisor, to adversely affect the JANI-KING franchise program, any JANI-KING trademarks, trade names or the goodwill associated therewith or Franchisor's interest therein.

(b) If Franchisee or any of its Principals discloses or divulges the contents of any confidential Franchise Operations or Policies and Procedures Manuals, or any other trade secrets or confidential information provided Franchisee by Franchisor contrary to the terms and conditions of this Agreement.

(c) If Franchisee abandons the JANI-KING Franchise business or otherwise forfeits the right to do transact business in the territory where the licensed business is located.

(d) If Franchisee or any of its Principals purport to transfer any rights or obligations under the Agreement to any third party without the Franchisor's prior written consent.

(e) If Franchisee makes any material misrepresentations relating to the acquisition of the franchise business.

(f) If the Franchisee repeatedly fails to comply with one or more requirements of the Agreement, an operations procedure, or JANI-KING Policies and Procedures, whether or not corrected after notice;

(g) If Franchisee fails to comply with any provision of this Agreement, any other agreement between Franchisor and Franchisee, and thereafter fails to cure such default to the satisfaction of the Franchisor within thirty (30) days after written notice has been given thereof. Defaults by the Franchisee shall include, without limitation, the occurrence of any of the following events:

(i) If Franchisee fails, refuses, or neglects promptly to pay any monies owing to Franchisor or its subsidiaries or affiliates when due, or to submit the financial information required by Franchisor under the Agreement, or makes any false statements in connection therewith.

(ii) If Franchisee fails to maintain the standards that Franchisor requires in this Agreement or provided in the confidential Franchise Operations Manual or JANI-KING Policies and Procedures Manual.

(iii) If Franchisee engages in conduct which reflects materially and unfavorably upon the operation and reputation of the JANI-KING franchise business or system.

(iv) If Franchisee fails, refuses or neglects to obtain the Franchisor's prior written approval or consent required by this Agreement, other than as provided in Section 8.1(d).

(v) If Franchisee or any of its Principals misuses or makes any unauthorized use of the JANI-KING proprietary trademarks, trade names, service marks or other materials, including any forms of advertising, otherwise materially impairs the goodwill associated therewith or Franchisor's rights therein.

(vi) If Franchisee is declared insolvent or bankrupt, or makes any assignment or trust mortgage for the benefit of creditors, or if a receiver, guardian, conservator, trustee in bankruptcy or similar officer shall be appointed to take charge of all or a part of Franchisee's property by a court of competent jurisdiction. This provision may not be enforceable under federal bankruptcy law (11 U.S.C.A., Sec. 101 et seq.)

8.2. The termination of this Agreement shall be without prejudice to any remedy or cause of action which JANI-KING may have against Franchisee for the recovery of any monies due JANI-KING or any equipment property of JANI-KING, or to any other right of JANI-KING to recover damages for any breach hereof.

JANI-KING OF LOUISVILLE, INC.
FRANCHISE AGREEMENT: 5/96 - 9/96

INT _RC_ INT
PAGE 18 OF 29

8.3. If the provisions of this Agreement provide for periods of notice less than those required by applicable state law, or provide for termination, cancellation, non-renewal or the like other than in accordance with applicable state law, Section 11.2.2. of this Franchise Agreement shall apply.

## SECTION 9

## TERM AND EXTENSION

9.1. Subject to Section 9.2 herein, this Agreement and the franchise and license granted hereunder, unless sooner terminated, shall be and remain in full force and effect for a period of Twenty (20) years from and after the "EFFECTIVE DATE" of this Franchise Agreement, being the date identified in the Franchise Summary, and shall expire immediately on that date.

9.2. Upon the expiration of the term of this agreement, if Franchisee shall give Franchisor written notice of its intent to exercise the provisions of this Section not less than eight (8) months nor more than twelve (12) months prior to the expiration date, and provided Franchisee shall not then be in default thereunder, and further conditioned upon Franchisee complying with the provisions of Sections 9.3 and 9.4 of this Agreement, Franchisee shall have the right, privilege, and option to enter into a new franchise agreement for an additional period of Twenty (20) years. This right may be exercised for the three (3) additional Twenty (20) year periods following the first exercise period, for a total of one hundred (100) years when initial periods and additional terms are combined.

9.3. Prior to the end of the then current term, Franchisee shall execute a general release, in a form prescribed by Franchisor, of any and all claims against Franchisor and its subsidiaries, and their respective officers, directors, agents and employees in their corporate and individual capacities, including without limitation, claims arising under this Agreement and any federal, state and local laws, rules and ordinances.

9.4. Prior to the end of the then current term, Franchisee agrees to execute the standard, franchise agreement then being used by Franchisor to offer a similar program to current, franchise prospects, which may differ substantially from the agreement under which the Franchisee has operated; and will execute such other ancillary agreements and documents as Franchisor may require. Franchisee understands that the newly executed agreement shall govern relations between Franchisor and Franchisee for the following Twenty (20) years. However, no additional Initial Franchise Fee or renewal fee shall be paid by Franchisee at the time of renewal, nor shall Franchisor be obligated to provide any additional Initial Business or training.

## SECTION 10

## TRANSFER

10.1. This agreement shall inure to the benefit of the successors and assigns of Franchisee. The interests of Franchisee in this Agreement are personal and may not be sold, assigned, transferred, shared or divided in any manner by Franchisee without the written consent of Franchisor, which consent shall not be unreasonably withheld. For purposes of Section 10, any change in stock ownership or voting or other control whatsoever of a corporation or a partnership which is a Franchisee under this Agreement constitutes a transfer. Any transaction or series of transactions which would have such an effect must be approved by Franchisor on the same basis as any other sale or transfer, as set forth herein.

JANI-KING OF LOUISVILLE, INC.
FRANCHISE AGREEMENT: 5/96 - 9/96

INT _RC_ _DiC_ IN
PAGE 19 OF 29

10.2. Franchisee agrees that a transfer fee equal to the greater of Two Thousand Dollars ($2,000.00) or ten percent (10%) of the sales price is appropriate as a transfer fee and shall be paid to Franchisor prior to the granting of consent to the sale or transfer. If no monetary consideration or other exchange of value is made for the transfer of a franchise, no Transfer Fee will be charged for a transfer to: (1) any party currently holding an interest in the franchise at the time of the transfer; (2) a controlled corporation in which the current owners of the franchise retain ninety (90%) percent or greater of the outstanding shares of stock; or (3) if the transfer is to an immediate family member of the current owner, whether a life time transfer or upon death. An administrative fee will be charged to cover necessary and reasonable costs and preparation of the documents associated with the transfer if no Transfer Fee is assessed. The current administrative fee is $250.00, but may be increased by Franchisor in the future.

10.3. Franchisee shall provide to Franchisor prior to the sale or transfer a copy of any written agreements relating to the proposed sale or transfer, or any additional information which Franchisor may require in order to determine if it will grant its consent to the proposed sale or transfer. It is agreed that consent for sale transfer or assignment will be granted only when all obligations hereunder are met, all debts of Franchisee are paid at the time of the sale or transfer, the buyer agrees to undergo the training required of a new JANI-KING Franchisee and the buyer agrees to execute a Franchise Agreement of the type then being used by JANI-KING which may differ substantially from the agreement under which the seller or transferor has operated.

10.4. Franchisee also agrees to provide, as a condition of Franchisor approving the sale, transfer, or assignment a personal covenant to the purchaser, in addition to the covenant contained in this Agreement, an agreement not to compete in the cleaning and/or maintenance services industry, nor to seek to divert business from Franchisor and its Franchisees for a period of at least two (2) years after transfer or sale. The transferor must also execute a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor Franchisor's parent corporation and affiliated corporations, and the officers, directors, shareholders and employees of Franchisor and each parent and affiliate corporation in their corporate and individual capacities including, without limitation, claims arising under this Agreement and federal, state and local laws, rules and ordinances.

10.5. This Agreement is fully assignable by Franchisor and shall inure to the benefit of any assignee or other legal successor to the interest of Franchisor.

## SECTION 11

## GENERAL

11.1. Nothing in this Agreement shall be construed to prevent Franchisee from freely setting its own prices and discounts for services and products which it may render or sell.

11.2.1. Should any part of this Agreement for any reason be declared invalid, such decision shall not affect the validity of the remaining portion, which remaining portion shall remain in force and effect as if the Agreement had been executed with the invalid portion thereof eliminated, and it is hereby declared the intention of the parties hereto that they would have executed the remaining portion of this Agreement without including herein any such part, parts, or portion which may, for any reason, hereafter be declared invalid.

11.2.2. If any applicable and binding law or rule of any jurisdiction requires a greater prior notice of the termination of or refusal to renew this Agreement than is required hereunder, or the taking of some other action not required hereunder, or if under any applicable and binding law or rule of any jurisdiction, any provision

the Agreement or any specification, standard or operating procedure prescribed by Franchisor is invalid or unenforceable, the prior notice and/or other action required by such law or rule shall be substituted for the comparable provisions hereof, and Franchisor shall have the right, in its sole discretion, to modify such invalid or unenforceable provision, specification, standard or operating procedure to the extent required to be valid and enforceable. Franchisee agrees to be bound by any promise or covenant imposing the maximum duty permitted by law which is comprehended within the terms of any provision hereof, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof, or any specification, standard or operating procedure prescribed by Franchisor, any portion or portions which a court may hold to be unenforceable in a final decision to which Franchisor is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order. Such modifications to this Agreement shall be effective only in such jurisdiction, unless Franchisor elects to give them greater applicability, and shall be enforced as originally made and entered into in all the jurisdictions.

11.3. This Agreement is the entire agreement between the parties and supersedes any and all agreements, including any other Franchise Agreement, previously made between the parties herein. All transactions between Franchisee and Franchisor regarding any operation of a JANI-KING franchise business granted under any Franchise Agreement dated prior to this Agreement shall be controlled by this Agreement. Any amendment or modification to this Agreement is invalid unless made in writing and signed by all the parties.

11.4. Franchisee acknowledges that neither Franchisor nor anyone on its behalf has made any representations, promises or agreements, orally or otherwise, respecting the subject matter of this Agreement which are not embodied herein.

11.4.1. Franchisee acknowledges that it has carefully read this Agreement, that ample opportunity has been provided for Franchisee to obtain the services of an independent legal or financial advisor, and that the Franchisee has had the opportunity to have the Franchise Agreement and all supporting disclosure documentation, as well as any other information gathered by the Franchisee, reviewed by an attorney or financial advisor of its own choice.

11.4.2. Franchisee further acknowledges that Franchisor does not authorize any representative of Franchisor to make any oral, written, visual or other claim or representation outside of the offering circular provided by Franchisor, and does not permit any promises, agreements, contracts, commitments or representations except those stated in this Agreement.

11.5. Franchisor may also conduct the type of business operated by the Franchisee.

11.6. In the event it becomes necessary for Franchisor or Franchisee to institute suit against the other party to secure or protect its rights under this Agreement, the prevailing party shall be entitled to recover as part of any judgment entered therein in its favor reasonable attorneys' fees, as well as court costs and damages.

11.7. It is agreed and understood that Franchisee will act at all times as an independent contractor and will not, at any time, directly or indirectly, hold itself out as an agent, servant or employee of Franchisor.

11.8. No waiver by Franchisor of any default in performance on the part of Franchisee, time being of the essence hereof and of performance hereunder, or like waiver by Franchisor of any breach or series of breaches, of any of the terms, covenants and conditions of this franchise shall constitute a waiver of any subsequent breach or waiver of said terms, conditions or covenants.

11.9.  Any notice required or permitted to be given shall be in writing and may be given by personal service or by depositing a copy thereof in the U.S. mail, certified, return receipt requested, with postage thereon fully prepaid, in a sealed envelope addressed to Franchisee at the address listed for the Franchisee in the Franchise Summary.

If notice is to be given to Franchisor, such notice shall be sent to:

Jani-King of Louisville, Inc.<br>
950 Breckinridge Lane, Suite 40<br>
Louisville, Kentucky  40207

The address hereby given for the service of notice may be changed at any time by either party through written notice to be given to the other as provided herein.

11.10.  THE PARTIES AGREE AND INTEND THIS INSTRUMENT TO BE EXECUTED, INTERPRETED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS. JURISDICTION AND VENUE IS DECLARED TO BE EXCLUSIVELY IN DALLAS COUNTY, IN THE STATE OF TEXAS.

11.11.  The submission of this Agreement does not constitute an offer to license, and this Agreement shall become effective only upon execution thereof by Franchisor and Franchisee.

11.12.  This Agreement shall not be binding on Franchisor unless and until it has been accepted and signed by an authorized representative of Franchisor at Franchisor's home office in Dallas, Dallas County, Texas.

11.13.  The numbers and headings of paragraphs used herein are for convenience only and do not affect the substance of the paragraphs themselves.

11.14.  The Franchisee certifies and warrants that all owners and spouses of owners or partners, if the franchise is a sole proprietorship or partnership; and all persons who are a shareholder, officer or director of any corporation who holds the franchise:  (1) are listed in the attached SCHEDULE OF PRINCIPALS; and  (2) that all such parties will execute all Guarantees or other documents required by JANI-KING.

ADDENDUM TO FRANCHISE AGREEMENT
IN THE STATE OF INDIANA

JANI-KING OF LOUISVILLE, INC.
(FRANCHISOR)

A.    Section 4.22 of the Franchise Agreement is amended to delete any provision for liquidated damages to the extent
      prohibited by IC 23-2-2.7-1(10).

B.    Section 9.3, 9.4 and 10.4 of the Franchise Agreement relating to future releases and waivers are amended to the extent
      necessary to comply with IC 23-2-2.7-1(5).

C.    Sections 4.14 and 5.1(c) of the Franchise Agreement relating to non-competition covenants after the franchise is
      terminated or expires is amended to delete (remove) the words "or any other territory covered by a JANI-KING
      Franchise Agreement."

D.    Section 11.10 of the Franchise Agreement relating to the choice of Dallas, Texas as the exclusive place for litigation
      between the parties, and that Texas law would govern such litigation, is deleted, in that Indiana Statute IC 23-2-2.7-
      1(10) prohibits the enforcement of such provisions in franchise agreements, and in its stead Section 11.10 shall
      provide that any court of proper jurisdiction shall be the forum for controversies between the parties and the law
      governing such forum shall apply.

IN WITNESS WHEREOF, the parties hereto have set their hands this _31st_ day of
_January_ , 199 _7_ .

JANI-KING OF LOUISVILLE, INC.

BY: _John Schubel_

TITLE: _Reg Director_

FRANCHISEE

_Randy C. Cochran_
(Signature of Owner, Partner or Authorized
Officer)

_RANDY C. COCHRAN_
(Print Name)
Social Security # _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_

_Bret V. Cochran_
By: (Signature of Partner or Spouse)

_Bret V. Cochran_
(Print Name)
Social Security # _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_

_____
By: (Signature of Partner or Spouse)

_____
(Print Name)
5Social Security #_____

COMPLETE IF FOR CORPORATION:

_____
(Corporate Name)

_____
(Title of Authorized Officer)
Federal Tax ID#: _____

ACCEPTED by the Home Office of Franchisor on this _10th_ day of _February_ , 199 _7_ .

BY: _Karen R. Hunter_
Authorized Representative

_RC_
INT _BC_ INT
PAGE 24 OF 29

## SCHEDULE OF PRINCIPALS

ANY OTHER PERSON NOT LISTED IN THIS AGREEMENT WHO IS A SPOUSE, PARTNER, OR AN OFFICER, DIRECTOR OR SHAREHOLDER OF FRANCHISEE:

Name:                 _____

Relationship:         _____

Taxpayer ID:          _____

Address:              _____
                      _____

Telephone:            _____


Name:                 _____

Relationship:         _____

Taxpayer ID:          _____

Address:              _____
                      _____

Telephone:            _____


Name:                 _____

Relationship:         _____

Taxpayer ID:          _____

Address:              _____
                      _____

Telephone:            _____


Name:                 _____

Relationship:         _____

Taxpayer ID:          _____

Address:              _____
                      _____

Telephone:            _____

# SCHEDULE ONE
## "OFFICE SUPPLY AND ADVERTISING PACKAGE"

LIST OF MATERIALS PROVIDED TO FRANCHISEE

| ITEM | AMOUNT |
|---|---|
| Business Cards (imprinted logo) | 1000 |
| JANI-KING Letterhead (matching envelopes and stationery) | 250 |
| Advertising Brochures | 125 |
| JANI-KING Tunics | 4 |
| Inspection Pads | 5 |
| Memo Pads | 10 |
| Past Performance Pads | 10 |
| Account Bid Sheet Pad | 1 pad |
| Contact Evaluation Pad (replace as needed) | 1 pad |
| JANI-KING Logo Binders | 2 |
| JANI-KING Executive Pad Holder | 1 |
| JANI-KING Trifold | 1 |
| JANI-KING Training Tapes | 1 set |
| JANI-KING Trust Your Keys Video | 1 |
| Account Follow-up Sheets (replace as needed) | 5 |
| New Account Start-Up (replace as needed) | 5 |
| Initial Clean Sign-Off Sheets (replace as needed) | 5 |
| Franchisee Request Cards (replace as needed) | 5 |
| Authorization for Extra Work Forms (replace as needed) | 5 |
| JANI-KING Business Card Order Forms | As Needed |

## "SUPPLY AND EQUIPMENT PACKAGE"

THE FOLLOWING SUPPLIES AND EQUIPMENT MUST BE PURCHASED
BY EACH FRANCHISEE PURSUANT TO THE FRANCHISE AGREEMENT AND
PRIOR TO FRANCHISOR OFFERING ANY OF THE INITIAL BUSINESS

The products listed may be purchased from Franchisor, subject to shipping restrictions, or any other
source. Prices currently charged by Franchisor may be changed or modified in the future.
(PROFESSIONAL PRODUCTS)

| ITEM | AMOUNT | ITEM | AMOUNT |
|------|--------|------|--------|
| All Purpose Cleaner (Biodegradable for use on walls, formica, etc. | 1 - one gallon container (or equivalent) | Glass Cleaner | 1 - one gallon container (or equivalent) |
| Neutral Floor Cleaner | 1 - one gallon container (or equivalent) | AJAX Scouring Powder | 2 - one quart containers (or equivalent) |
| Pumice Stone | 1 each | Floor Finish Stripper | 2 gallons |
| Rinse Neutralizer | 1 - one gallon container (or equivalent) | Carpet Cleaning Concentrate (Bonnet Method) | 1 gallon |
| Small Trash Liners (10-12 gallon capacity) | 1 case | High Gloss Floor Finish | 5 gallons |
| Large Trash Liners (40-45 gallon capacity) | 1 case | Carpet Spot Remover | 1 can |
| Dust Mop Treatment | 1 can | Stainless Steel Cleaner | 1 can |
| Restroom Disinfectant | 1 - one gallon container (or equivalent) | Latex Gloves | 6 pair |
| 17" Red Buffing Pads | 5 | Disposable Gloves | 6 pair |
| 17" Black Stripping Pads | 5 | 17" Bonnet/Brush Combination | 1 |
| Roll-a-round Trash Container (32 gallon capacity) | 1 | Brute Container Caddy | 1 |
| Maid Carry-All Caddy Container | 1 | Janitor Dust Pan | 1 |
| 14" Window Stripwasher with Sleeve | 1 | 16" Window Squeegee Channel | 1 |
| 16" Window Squeegee Rubber Blade | 1 | 8" Window Squeegee Channel | 1 |
| 8" Window Squeegee Rubber Blade | 1 | Window Squeegee Handle | 1 |
| 8' Extension Pole | 1 | One Quart Spray Bottle | 6 |
| Trigger Sprayer | 6 | Mop Bucket (26 quart minimum) | 2 |
| Mop Wringer | 2 | Swivel Dust Mop Handle | 1 |
| Bucket (For Mixing and Dispensing Solutions) | 1 | Wet Mop Head (24 oz) | 4 |
| Dust Mop Head | 1 | | |

## "SUPPLY AND EQUIPMENT PACKAGE" - Continued

| ITEM | AMOUNT | | ITEM | AMOUNT |
|---|---|---|---|---|
| Dust Mop Frame | 1 | | Plastic Angler Broom | 1 |
| Wet Mop Handle | 2 | | Package of Disposable Wipes | 1 |
| Sanitary Bowl Swab | 2 | | Putty Knife | 1 |
| Toy Broom | 1 | | Lambswool Duster (Telescoping) | 1 |
| Carpet Rake | 1 | | Commercial Sponge with Scrubber | 1 |
| Commercial Sponge | 1 | | Wet Floor Caution Sign | 1 |
| 8 oz. Measuring Cup | 1 | | Counter Brush | 1 |
| Toilet Bowl Brush (non-metal) | 1 | | Cotton Cleaning Cloths | 5 lbs. |
| Doodle Bug Holder and Pads (3) | 1 | | Rubber Door Stop | 1 |
| Metal Tipped Handle for Doodle Bug | 1 | | | |
| Electronic Pager (not available through Franchisor) | 1 | | | |

Franchisor may adjust the items included in the Supply and Equipment Package as industry standards change

"ADDITIONAL ELECTRIC EQUIPMENT"

THE FOLLOWING EQUIPMENT MUST BE PURCHASED BY EACH
FRANCHISEE PURSUANT TO THE FRANCHISE AGREEMENT AND PRIOR
TO FRANCHISOR OFFERING ANY OF THE INITIAL BUSINESS

The products listed may be purchased from Franchisor or any other source.
Prices currently charged by Franchisor may be changed or modified in the future.

| QUANTITY | DESCRIPTION | UNIT PRICE |
|---|---|---|
| 1 | 12"Upright commercial 7 AMP vacuum with top-filled cloth bag, 50 ft. cord, headlamp. | $226.92 each |
| 1 | 17" Floor Buffer with 1.5 HP electric motor, capacitor start, all steel planetary gearing (includes pad driver) | $646.80 each |
| 1 | Wet/Dry vacuum with 15 gallon tank, including tool package | $393.33 each |
| 1 | Compact Portable Vacuum Cleaner (Canister Type) w/ shoulder strap and cloth bag | $94.12 each |